ORIGINAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/21/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LUIS VARGAS and BULLY SOUND RECORDS, INC.,

                Plaintiffs,

- against -

VIACOM INTERNATIONAL, INC. a/k/a VH1 Networks, MONAMI ENTERTAINMENT LLC, NFGTV, INC. a/k/a Eastern, NEW POP CULTURE PRODUCTIONS, INC. and JAMES ROSARIO,

                Defendants.

18 Civ. 474 (LLS)

**OPINION & ORDER**

Plaintiffs Luis Vargas and Bully Sound Records, Inc. ("Bully Sound") move under Fed. R. Civ. P. 65(a) for a preliminary injunction restraining Viacom International, Inc. a/k/a VH1 Networks, Monami Entertainment LLC, NFGTV, Inc. a/k/a Eastern, and New Pop Culture Productions, Inc. (collectively "Network Defendants") from copying, broadcasting, selling, downloading, uploading, licensing, advertising, and displaying the copyrighted recording of "BAD GIRL" and the scenes depicting the song's unauthorized music video, in any and all mediums, including licensed broadcasts of the Show by third party Internet distribution platforms, during the pendency of this litigation. For the reasons that follow, the motion is denied.

## BACKGROUND

Plaintiff Bully Sound is a New York record company and

music publishing company that is wholly owned by Plaintiff Luis Vargas. Pl. Br. (Dkt. No. 64) Ex. 7 ("Vargas Aff.") ¶¶ 3, 5. Plaintiffs entered into agreements with Defendant James Rosario, a recording artist, naming Bully Sound as the exclusive manager of Rosario's entertainment career, and assigning Rosario's ownership rights in his works to Bully Sound. Id. ¶ 7.

On November 17, 2016, Plaintiffs produced a sound recording of "BAD GIRL," a song with Rosario performing as the lead singer (the "Recording"). Id. ¶ 10. Bully Sound owns the copyrights to both the sound recording and the music and lyrics of "BAD GIRL." Id. ¶ 9.

Rosario was featured as a lead cast member on the reality television series "Love & Hip Hop New York" (the "Show"). Id. ¶ 12. Without obtaining a license or other authority from Plaintiffs, the Network Defendants broadcast portions of the Recording in two episodes of the Show in November and December of 2017. Id.

Plaintiffs commenced this copyright infringement action on January 18, 2018. They contacted the Network Defendants to discuss potential settlement and state their intent to file a motion for a preliminary injunction. Id. ¶ 14. The Network Defendants requested, and Plaintiffs agreed, that the parties instead enter into an interim Litigation Agreement that would provide Plaintiffs with the relief requested in a motion for

preliminary injunction. Id. ¶¶ 15-16.

In or about February of 2018, Viacom undertook to ensure that the original versions of the two episodes containing the Recording were removed from domestic linear distribution for cable network television. Landau Decl. ¶¶ 2-3. It replaced the original episodes with replacement episodes, which do not contain any portion of the Recording, on Viacom's website (VH1.com) and the VH1 application. McDuffie Decl. ¶ 5. It also confirmed that the original episodes are not available on subscription video on demand platforms such as Netflix and Hulu. Id.

The Litigation Agreement, signed on April 10, 2018 but textually "dated and to be effective" as of March 19, 2018, states,

> Pending the final adjudication of plaintiffs' claims, an Order of the Court, or the further written agreement of the Parties, the corporate defendants will not use the Recording in any manner or display the song title "Bah Gurl" and will either blur the images of the Video or substitute replacement footage for the Video (in either event, such that the Video is obscured or removed), in any future broadcasts of the Program, whether in a re-broadcast of any existing episode or in any so-called "reunion show" of the Program, in any medium.

Pl. Br. Ex. 1 ¶ 1(a).

After the parties signed the Litigation Agreement, Vargas discovered that the Network Defendants continued to broadcast original versions of the two episodes on VH1's YouTube channel. Vargas Aff. ¶ 18. On May 17, 2018, Plaintiffs sent a letter to

the Network Defendants informing them of their violation of the Litigation Agreement. Id. ¶ 19. Viacom investigated and determined that no full episodes of the Show appeared on the YouTube channel. Pomeroy Decl. ¶¶ 3, 5. However, short "teasers," or brief clips, of the original episodes had inadvertently remained on the YouTube channel, which Viacom removed from the channel on the same day it received the letter of notice from Plaintiffs. Id. ¶¶ 5-6. The next day, on May 18, 2018, the Network Defendants informed Plaintiffs that the segments of the episodes had been removed from YouTube and were no longer accessible. Rosenberg Decl. ¶ 2, Ex. 1.

Vargas believes that on September 27, 2018, the VH1 network broadcast the two original episodes on its international television network and website. Vargas Aff. ¶ 20.

Vargas also learned that as of November 8, 2018, the two original episodes were still being offered for sale on third-party Internet distribution platforms Amazon and YouTube Red. Id. ¶ 21; Pl. Br. Ex. 6 ("Dameron Aff.") ¶ 5. On November 9, 2018, Plaintiffs notified the Network Defendants of their violations of the Litigation Agreement. Vargas Aff. ¶ 22. Viacom investigated and determined that the original episodes had inadvertently remained available for purchase on both Amazon and YouTube Red, which receives its content from Google Play. McDuffie Decl. ¶¶ 7-8. However, the original episodes were never

available for streaming on the regular VH1 YouTube site or to Amazon Prime subscribers. Id. On November 9, 2018, the same day it received notice, Viacom contacted Amazon and Google in writing and supplied them with the replacement episodes. Id. ¶ 9. Amazon and Google (which outsources such matters to a Sony-affiliated entity) promptly confirmed in writing to Viacom that they would replace the original episodes with the replacement episodes. Id. ¶ 10.

On or about November 12 and 14, 2018, the Network Defendants informed Plaintiffs over the telephone that the availability of the original episodes for purchase on Amazon and YouTube Red was inadvertent, and that corrective action had been taken. Rosenberg Decl. ¶ 3. The Network Defendants then sent a letter to Plaintiffs on November 19, 2018 confirming that the original episodes had not been aired on conventional linear television broadcasts since January of 2018. Id. ¶ 4, Ex. 2; Landau Decl. ¶ 5.

However, Vargas learned that the original episodes continued to be available for purchase on YouTube Red as of November 19, 2018. Vargas Aff. ¶ 23; Dameron Decl. ¶ 8. On November 21, 2018, Plaintiffs filed their motion for a preliminary injunction.

On November 26, 2018, a member of Viacom's operations team, Ladylette Bueno, emailed representatives of Google and Sony,

asking them to confirm that they replaced the original episodes with the replacement episodes on YouTube. McDuffie Decl. ¶ 12, Ex. A. She asked in another email, "Can you please let us know if the original assets were removed or taken down? They had to be taken down due to a legal issue and we'd like to make sure that the old files are no longer up." Id. The Google representative responded on the same day, explaining that Google had neglected to send to Sony the request to replace the episodes because Google did not "CC," or copy, Sony on the relevant email. Id. ¶ 13. The Google representative then CC'ed and added the Sony representative to the email chain between Google and Ms. Bueno. Id. Later that day, the Sony representative confirmed to Ms. Bueno that Sony had begun the process of replacing the original episodes, and that he "expect[ed] them to deliver shortly." Id. ¶ 14, Ex. A. The original episodes were removed from YouTube Red and replaced, and were not available after on or about that same day, November 26, 2018. Id. ¶ 15.

On November 28, 2018, the Network Defendants informed Plaintiffs that the availability of the original episodes on YouTube Red had not been the result of the Network Defendants' actions or inaction but rather of Google's miscommunication to Sony of Viacom's request for replacement of the episodes. Rosenberg Decl. ¶ 6. They also stated their commitment to

ensuring that the original episodes do not become available on any media platform under their control. Id. On or about November 30, 2018, the Network Defendants confirmed to Plaintiffs their intention to strictly comply with the Litigation Agreement. Id. ¶ 7.

**DISCUSSION**

A party seeking a preliminary injunction must demonstrate "(1) irreparable harm and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." Oneida Nation of New York v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011) (citation and internal quotation marks omitted). "Additionally, the moving party must show that a preliminary injunction is in the public interest." Id.

Irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," and "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." Grand River Enter. Six Nations, Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007) (citation and internal quotation marks omitted). "A court may not presume irreparable injury in the copyright context; rather the plaintiff must demonstrate

actual harm that cannot be remedied later by monetary damages should the plaintiff prevail on the merits." Getty Images (US), Inc. v. Microsoft Corp., 61 F. Supp. 3d 296, 299 (S.D.N.Y. 2014). "Irreparable harm is an injury that is not remote or speculative but actual and imminent . . . ." Tom Doherty Assocs., Inc. v. Saban Ent., Inc., 60 F.3d 27, 37 (2d Cir. 1995). "Demonstrating the mere possibility of harm is not sufficient to warrant the drastic imposition of a preliminary injunction." REDF Organic Recovery, LLC v. Kafin, No. 12 Civ. 7973, 2012 WL 5844191, at *2 (S.D.N.Y. Nov. 19, 2012).

Plaintiffs argue that without a preliminary injunction, they will suffer the irreparable harm of being deprived of their exclusive right to decide whether to authorize transmission of the Recording; the ability to market and gain notoriety for the Recording and related derivative works; and revenue from the Recording. Pl. Br. at 13. They also contend that they will suffer damage to their reputation among artists and record labels, who will view Plaintiffs as unable to control the distribution of their music and the activities of their artists. Id.

Nevertheless, the Network Defendants have taken affirmative steps to ensure that the original episodes of the Show containing the Recording are no longer available to the public and have represented to Plaintiffs that they will not broadcast

the original episodes in the future.

"While voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, . . . in order to obtain an injunction . . . the moving party must satisfy the court that relief is needed — there must be some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." Getty, 61. F. Supp. 3d at 300 (quoting Bowater S.S. Co. v. Patterson, 303 F.2d 369, 371-72 (2d Cir. 1962)) (omissions in original).

On each occasion when the Network Defendants learned that the original episodes were still publicly available, they promptly took corrective action. Before the parties entered into the Litigation Agreement, Viacom had removed the original episodes from distribution for cable network television, subscription video on demand platforms, its website, and its application. Landau Decl. ¶ 3; McDuffie Decl. ¶ 5. On May 17, 2018, when Plaintiffs notified the Network Defendants that the original episodes were still on VH1's YouTube channel, Viacom removed the remaining short clips of the original episodes that same day. Vargas Aff. ¶ 19; Pomeroy Decl. ¶¶ 4-6. On November 9, 2018, when Plaintiffs informed the Network Defendants that the two original episodes were still available for sale on Amazon and YouTube Red, Viacom contacted Amazon and Google and supplied

them with replacement episodes that same day. Vargas Aff. ¶ 22; McDuffie Decl. ¶ 9. When Plaintiffs filed their motion for a preliminary injunction on November 21, 2018, and the Network Defendants learned that the episodes remained available on YouTube Red due to Google's failure to communicate to Sony Viacom's request to replace the episodes, Viacom reached out to Google and Sony again, and the original episodes were removed and have not been available for purchase after November 26, 2018.[1] McDuffie Decl. ¶¶ 12-14. See Bourne v. Walt Disney Co., No. 02 Civ. 6400, 2003 WL 721405, at *7 (S.D.N.Y. Mar. 3, 2003) (holding that the plaintiffs failed to demonstrate irreparable harm because defendant "called for the creation of new masters that excluded the Song Trailer from each of the seven movies on which it appeared," "directed [BVHE] personnel that no further distribution be made," and "directed the BVHE customer service representatives to cease selling product containing the Song") (alteration in original); compare Abbott Labs. v. Adelphia Supply USA, 15 Civ. 5826, 2015 WL 10906060, at *13 (E.D.N.Y. Nov. 6, 2015) (granting motion for preliminary injunction

---

[1] That it took the Network Defendants until November 26, 2018 to have the episodes replaced does not deserve Plaintiffs' characterization as "a complete lack of care and diligence . . . ." Pl. Reply Br. at 9-10. After the Network Defendants asked Amazon and Google to replace the episodes, Google and Amazon promptly confirmed that they would do so. The Network Defendants had no reason to know that Google had failed to inform Sony of the request for replacement until Plaintiffs filed their motion for a preliminary injunction on Thursday, November 21, 2018. The original episodes were then quickly removed and replaced by the Monday after Thanksgiving weekend, November 26, 2018. McDuffie Decl. ¶ 15.

despite voluntary cessation because "[u]nlike defendants who take affirmative actions to prevent recurrence, however, Lev Rx here simply avers that it will stop the infringing activity," which "does not eliminate all cognizable dangers of a recurrent violation.").

Plaintiffs have not argued or shown an actual or imminent risk that the Network Defendants will seek to broadcast the original episodes again on any of its or third parties' platforms. Thus, there is a possibility but not a present danger of a recurrent violation. See Getty, 61 F. Supp. 3d at 300 (finding that plaintiff's argument that "Microsoft could re-launch the Widget, either in its current form or a new form, in a manner that would continue to infringe Getty's content" was "purely speculative" and "insufficient to establish a cognizable danger of a recurrent violation during the pendency of this lawsuit," and that "there is no basis to question the reliability of Microsoft's representations regarding its future conduct").

The Network Defendants have reassured Plaintiffs that the original episodes have not been aired on television since January of 2018.[2] Rosenberg Decl. ¶ 4, Ex. 2. They have

---

[2] Although Plaintiffs believe that the original episodes were aired again on September 27, 2018 (Vargas Aff. ¶ 20), they point to no evidence supporting that belief. Coreh Dameron's affidavit states that on or about September 27, 2018, he viewed the broadcast of the Show, "including Episodes that featured

represented to Plaintiffs that they are "committed to continuing to ensure that the Original Episodes would not become available on any media platform under their control in the future" (id. ¶ 6), and Viacom's Vice President of Multiplatform Strategy stated in her declaration, "I understand Viacom does not intend to make the Original Episodes available on any Distribution Platform in the future" (McDuffie Decl. ¶ 16). See Getty, 61 F. Supp. 3d at 300 (holding that plaintiff did not meet its burden of establishing irreparable harm because of "Microsoft's prompt disabling of the Widget," "written representations in opposition to this motion that it will not re-launch the Widget using content that is not licensed or in the public domain during the pendency of this lawsuit," and statements "that it does not presently intend to launch any similar iteration of the Widget at any point in the future").

Plaintiffs also argue that they will suffer irreparable harm from other cast members' insults and criticisms directed at Rosario and the Recording on the Show, such as "this here is some lame video release party," "homeboy what you sellin', your face or your music?", or "this song is trash." Pl. Reply Br. at 11. Plaintiffs contend that because one of the cast members asked Rosario on the Show, "You Bully, right?", the insults made

---

Mr. James Rosario," but makes no claim that those episodes involved the song. Dameron Aff. ¶ 4.

-12-

about Rosario and the Recording equate to insults about Bully Sound, damaging Plaintiffs' reputation. However, the possible damage to Plaintiffs' reputation from the negative and disparaging comments about the Recording and Rosario's music video party is not infringement of Plaintiffs' copyright.

Plaintiffs also argue that the broadcast of scenes of the music video on the Show, even the parts without the music, supports the impression that Rosario is an independent artist, rather than Bully Sound's artist. Id. at 15. But Rosario's relationships have little Copyright Act significance.

For lack of a demonstrated irreparable harm in the absence of an injunction, the remaining requirements for a preliminary injunction need not be addressed.

**CONCLUSION**

Plaintiffs' motion for a preliminary injunction (Dkt. No. 63) is denied.

So ordered.

Dated:  New York, New York
        March 21, 2019

_Louis L. Stanton_
LOUIS L. STANTON
U.S.D.J.